Carol G. HACKMAN, Individually and in her Capacities as Surviving Spouse of Charles H. Hackman, and as Administratrix of the Estate of Charles H. Hackman, Deceased, and Charles H. Hackman, Jr., Plaintiffs Below, Appellants,

v.

CHRISTIANA CARE HEALTH SERVICES, INC., a/k/a Christiana Care Health System, a corporation of the State of Delaware, William J. Schickler, M.D., P.A., William J. Schickler, M.D., Vascular Consultants, P.A., a corporation of the State of Delaware, Bruce A. Fellows, M.D., and Vascular Surgery Associates, P.A., a corporation of the State of Delaware, Defendants Below, Appellees.

No. 514,2003.

Supreme Court of Delaware.

Submitted: Sept. 8, 2004.
Decided: Nov. 15, 2004.

Ben T. Castle (argued), and Neilli Mullen Walsh, of Young, Conaway, Stargatt & Taylor, L.L.P., Wilmington, for Appellants.

Dennis D. Ferri (argued), of Morris, James, Hitchens & Williams, L.L.P., Wilmington, for Appellee Christiana Care Health Services, Inc., a/k/a Christiana Care Health System, and Danielle K. Yearick (argued), of Tybout, Redfearn & Pell, Wilmington, for Appellee William Schickler, M.D., P.A. and William J. Schickler, M.D. and Vascular Consultants, P.A., and John A. Elzufon, (argued), and Colleen D. Shields, of Elzufon, Austin, Reardon, Tarlov & Mondell, P.A., Wilmington, for Appellees Bruce A. Fellows,

M.D., and Vascular Surgery Associates, P.A.

Before STEELE, Chief Justice, BERGER and JACOBS, Justices.

BERGER, Justice:

In this appeal, we consider whether the Superior Court erred in excluding expert testimony in a medical malpractice case. Appellant's expert was prepared to testify that it would have been a breach of the applicable standard of care if the appellee surgeon had punctured the patient's duodenum during surgery. But there was no evidence that the surgeon did puncture the duodenum, and even appellant's expert did not believe that the perforation that later proved fatal to the patient occurred during the surgery. Given these facts, we conclude that the trial court acted within its discretion in excluding the disputed expert testimony. Since appellant had no other medical expert to opine that there was a breach of the standard of care, the trial court properly granted the surgeon's motion for judgment as a matter of law.

Factual and Procedural Background

On November 24, 1998, William J. Schickler, M.D., a board certified vascular surgeon, operated on Charles Hackman to repair an abdominal aortic aneurysm. Due to the size and location of the aneurysm, the surgery took almost ten hours, twice as long as expected. Schickler had to use surgical scissors to separate the duodenum, which is part of the bowel, from the aorta. There were no reported complications immediately following the surgery.

The next day, Schickler examined Hackman, and saw no evidence of bleeding. Hackman's vital signs were stable and his femoral pulses indicated · that the aortic repair was functioning properly. That evening, Schickler went off-call for Thanksgiving. For the next five days, Hackman was transferred to the care of surgical residents at Christiana Care Health Services, Inc. and Bruce A. Fellows, M.D., also a board certified vascular surgeon. By Saturday, November 28th, Hackman was suffering increased pain, labored breathing, difficulty speaking, and abdominal swelling and tenderness. The attending physician believed that Hackman had developed pneumonia, which is not an unusual complication. On the evening of November 29th, Fellows telephoned Schickler and reported that Hackman had been placed back on a ventilator because he had developed pneumonia. Fellows reported no evidence of a breakdown of the bowels or any other abdominal problem.

When Schickler returned on November 30th, he immediately recognized serious deterioration in Hackman's condition. Hackman had no bowel sounds, his abdomen was distended, and he was complaining of significant abdominal pain. Schickler called Dr. Zern, a general surgeon, to perform emergency surgery. During that surgery, Zern and Schickler found bile-stained fluid in the abdomen and a hole in the duodenum. Zern attempted to repair the perforation, but due primarily to the level of infection and leakage that had already occurred, the repair failed.

On December 3rd, Zern attempted a second repair of the duodenum, but Hackman's condition continued to deteriorate. He remained in the Christiana Care hospital, undergoing multiple procedures, until February 10, 1999, when he was transferred to the University of Pennsylvania hospital for further abdominal surgery. Dr. Jeffrey Carpenter performed emergency surgery that day, but Hackman died on the operating table.

Hackman's wife and son filed suit against Schickler, his professional corpora-

744

tion, Vascular Consultants, Christiana Care Health Services Inc., Fellows, and his professional corporation, Vascular Surgery Associates. Appellants alleged that Schickler negligently: (1) perforated Hackman's duodenum during the November 24th surgery; and (2) failed to leave adequate instructions for the other attending physicians during the period that Schickler was on vacation. They also alleged that the hospital and its attending physicians should have detected the duodenal perforation before the November 30th emergency surgery, in light of symptoms that were apparent no later than November 29th.

On the first day of the trial, Schickler moved to exclude certain testimony of Dr. Novin, appellants' only medical expert. Novin was prepared to testify that, although he did not believe that Schickler had done so, if Schickler had perforated the bowel during the November 24th surgery, then that would have been a breach of the standard of care. The trial court granted Schickler's motion, reasoning that Novin's testimony was merely hypothetical, since there was no evidence that the perforation occurred during that surgery. The court concluded that the testimony would be unduly prejudicial and confusing.

The trial court also excluded Carpenter's Report of Operation. The Report, which had been admitted into evidence without objection, included a statement that, "[t]here was a duodenal injury at the time of the aneurysm repair, which went unrecognized; and [the] patient developed abdominal sepsis . . ." As appellants' counsel was asking Schickler to read that sentence, appellees objected on hearsay grounds and the objection was sustained.

At the close of all the evidence, the trial court granted Schickler's motion for judg-

ment as a matter of law. The court found that there was no evidence from which a jury could find that Schickler's alleged lack of instructions to the other attending physicians caused any harm. The jury returned verdicts in favor of the remaining appellees. This appeal followed.

DISCUSSION

■ In order to survive a motion for judgment as a matter of law, appellants must produce medical expert testimony that specifies (1) the applicable standard of care, (2) the alleged deviation from that standard, and (3) the causal link between the deviation and the alleged injury.[1] Appellants attempted to meet this burden by having Novin testify that, if Schickler had perforated the duodenum during the November 24th surgery, Schickler would have breached the applicable standard of care. Appellants then intended to rely on other evidence, including Schickler's admissions, to establish that he did, in fact, puncture the duodenum. There was no dispute about the fact that the perforated duodenum caused the serious injuries that culminated in Hackman's death.

Having excluded Novin's surgery standard of care testimony, the trial court did not even consider the negligent surgery claim when ruling on Schickler's motion for judgment as a matter of law. The trial court found that the remaining claim—that Schickler negligently failed to provide Fellows with enough information about Hackman's condition after the surgery—was unsupported in the record. Accordingly, the trial court granted Schickler's motion for judgment as a matter of law.

Appellants did not appeal the decision on the "lack of information" claim, and they only suggest in passing that the surgery claim remained viable despite the

1. *Green v. Weiner,* 766 A.2d 492, 494–495 (Del.2001); 18 *Del. C.* § 6853.

exclusion of Novin's testimony.[2] The crux of their appeal is that Novin's testimony should have been allowed. They argue that Novin's testimony, combined with the note in Carpenter's report and Schickler's trial testimony, provided enough evidence to defeat a motion for judgment as a matter of law. We disagree.

 Viewing the evidence in the light most favorable to appellants, one could conclude that Schickler "nicked" or "bruised" the duodenum during the first surgery. There is no evidence, however, that Schickler punctured it. This distinction is critical because no medical expert, including Novin, was prepared to testify that it would be a breach of the standard of care for a surgeon to nick or bruise the duodenum during a complicated surgery such as this one. Thus, without evidence that Schickler actually punctured the bowel, there was nothing to support a finding of negligence.

Novin and Schickler basically agreed on what happened during the aneurysm surgery and on the conclusion that the perforation occurred several days later. Novin also opined unequivocally that Schickler did not breach the applicable standard of care during the course of the surgery:

> Q: And here's a sentence in the report which says, "in his opinion," meaning yours, "a breach in the standard of care occurred with an instrumentation perforation injury to the duodenum."
> Am I correct that you do not agree with that statement?
>
> A: I modified it, that the procedure of dissecting the duodenum off the aorta and the aorta off the duodenum using clamps, scissors, fingers, knives, retractors, resulted in damage to the fourth

portion of the duodenum that caused the perforation that was manifest 24 to 48 or even 72 hours after the operative procedure was completed.

> Q: You do not believe that there was an instrumentation perforation during the surgery, correct?
>
> A: That is correct.

> \* \* \*

> Q: Other than failing to, in your opinion, communicate to Dr. Fellows the length and difficulty of this aneurysm repair, do you have any other opinions that Dr. Schickler breached the standard of care in the treatment he rendered to Mr. Hackman?
>
> A: No.

Schickler's testimony provided no evidence to the contrary. After the November 30th surgery, during which he and Zern discovered the hole in Hackman's duodenum, Schickler thought about how the perforation occurred. He told the Hackman family and, later, the attorneys, the same thing:

> Q: And I would expect the next natural question [from the family] would be; how did that happen? Do you remember any discussion about that?
>
> A: I stated to the family that this may very well have been following the manipulation of the duodenum.

> \* \* \*

> Q: ... I asked you when you saw the perforation with Dr. Zern, this would have been on November 30, did you make a judgement at that time about what had caused it? Could you tell us what your answer was?

**2.** We are not considering appellants' one paragraph argument on this point because, among other things, it does not appear that it was presented to the trial court. See: Supr. Ct. R. 8.

A: My concern was that it was possibly related to the mobilization of the duodenum to get to his aorta.

Later in his testimony, Schickler agreed that, if he had punctured the duodenum, and he failed to notice that it was leaking for three to four hours, that he would have breached the standard of care. But he did not believe that he punctured the duodenum, and he explained why:

Q: Did you make a hole in the duodenum?

A: No, ma'am.

Q: How do you know?

A: Because the duodenum is sitting right there.... At the end of the procedure you close that big aneurysm sack over the graft, you then close the retro peritoneal because you want to keep your aneurysm repair separate from the intestines. That process, the duodenum is sitting right there in middle of your operative field. The hole, if it were to be made, would have been made early in the operation. This would have been leaking for at least three, four, five hours before we closed.

\* \* \*

Q: Describe for the jury, if you could, we heard leakage and fluid; what would the leakage look like?

A: We would expect it to be greenish color because it is right after the bile duct enters the duodenum.

Q: Would that be noticeable and how would that appear?

A: Extremely easy to notice.

In sum, the evidence relating to the initial surgery, and the manner in which Schickler performed that surgery, was consistent. The aneurysm repair was a very difficult procedure that required manipulation of the duodenum. During that surgery, Schickler may have nicked or bruised the duodenum.[3] At some point during the five days following the surgery, the duodenum perforated. Although it would have been a breach of the applicable standard of care if Schickler had punctured the duodenum during the surgery, there are no facts suggesting that the perforation occurred at that time.

Based on our review of the record, we are satisfied that the Superior Court acted within its discretion in excluding Novin's standard of care opinion relating to the surgery. Since there was no factual support for the predicate assumption—that Schickler punctured the duodenum during the surgery—Novin's opinion lacked probative value and, if admitted, could have confused the jury. The same lack of evidence required the entry of judgment in Schickler's favor, as there was no medical expert testimony from which a jury could find that he breached the applicable standard of care.

### Conclusion

Based on the foregoing, the judgment of the Superior Court is affirmed.

---

**3.** Carpenter's report, which was excluded from evidence, is not necessarily inconsistent with that conclusion. The report stated that there was a "duodenal injury at the time of the aneurysm repair, which went unrecognized...." Whether labeled a "nick," "bruise," or "injury," the fact remains that it was something other than a puncture.