IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| David K. Werner, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N12C-02-191 JAP |
| | ) | |
| Nanticoke Memorial Hospital, Inc., | ) | |
| and | ) | |
| Emergency Physicians Medical | ) | |
| Group of Delaware, P.A., | ) | |
| | ) | |
| Defendants. | ) | |

## **ORDER**

1.  This is a medical negligence case where Plaintiff, David K. Werner, alleges that Defendants' failure to properly treat him for an ischemic stroke[1] in the emergency room resulted in "permanent right-sided paralysis."[2]  Defendant Emergency Physicians Medical Group ("EPMG") has filed this motion *in limine* to exclude expert testimony from a neurologist about the standard of care of an emergency room physician.[3]  This is the court's ruling on that motion.

2.  Plaintiff alleges he was taken to the emergency room at Nanticoke Memorial Hospital after experiencing an "episode of dizziness, loss of balance and loss of movement control on the right side of his

---

[1]   An ischemic stroke is caused by a blockage in a blood vessel, as opposed to a hemorrhagic stroke which is caused by a rupture of a blood vessel.
[2]   Second Am. Compl. ¶¶ 6-16 (D.I. # 32).
[3]   Def. Mot. Lim. at 1 (D.I. # 95).

body."[4]  He was examined at the Nanticoke emergency room by Dr. Frederick Bauer, an employee of EMPG.[5]  Dr. Bauer ordered a CT Scan of Plaintiff's head and an MRI of his brain.[6]  The MRI revealed an "[a]cute infarct in the left limb of internal capsule."[7]  Upon receiving the results of the MRI, Dr. Bauer ordered to have Plaintiff transferred by ambulance to another hospital to consult a neurologist.[8]  According to Plaintiff, this occurred roughly eight hours after he first arrived at the emergency room.[9]  Plaintiff contends that he should have been promptly examined by a neurologist and been given a "clot busting" drug known as tPA.[10]  By the time he was seen by a neurologist, Plaintiff alleges, it was too late to give him tPA, and, as a result, he suffered irreversible right sided paralysis.[11]

3.   Not surprisingly, one of the central issues in this case is the standard of care required of an emergency room physician.  Plaintiff proposes to call a board-certified neurologist, Dr. Alan Fink, to testify about that standard of care.  EMPG objects, claiming Dr. Fink is not qualified under the Medical Negligence Act to testify about the standard of care required of emergency room physicians.

---

[4]   Second Am. Compl. ¶¶ 5-6 (D.I. # 32).
[5]   *Id.* ¶ 7.
[6]   *Id.* ¶¶ 8, 10.
[7]   *Id.* ¶ 10.
[8]   *See id.* ¶ 11.
[9]   *Id.* ¶ 12.
[10]   *See id.* ¶ 12.  "tPA" stands for tissue plasminogen activator.  It is a protein associated with the breakdown of blood clots which is administered by an intravenous line.  There are several contraindications for administration of the drug.
[11]   *Id.* ¶¶ 12, 16.

4. Dr. Fink has no apparent qualifications as an emergency room physician. At his deposition he testified that he "moonlight[ed] in the emergency room" between 1973 and 1975.[12] He conceded, however, that many of the standards related to emergency room physicians have changed since then.[13] The court notes, in particular, that tPA was not approved by the FDA for treatment of strokes until 1996. It goes without saying therefore that Dr. Fink's moonlighting experience in an emergency room some forty years ago does not qualify him to testify about the standard of care applicable to emergency room physicians today.

5. Plaintiff also points to Dr. Fink's deposition testimony that he "consulted with emergency room physicians for 35 years." This too does not qualify him to give standard of care testimony about emergency medicine. The record does not disclose how many of these consultations involved the decision to administer tPA. More importantly, assuming these consultations gave Dr. Fink some degree of familiarity with instances in which emergency room physicians refer patients to a neurologist, they necessarily would not have provided him with information about the circumstances in which emergency room physicians decide not to seek such a consult. Thus, his past consultations do not qualify Dr. Fink to give expert testimony distinguishing the circumstances under which emergency room physicians make referrals from those in which they do not.

---

[12] Def. Mot. Lim., Ex. C. at 37 (D.I. # 95).
[13] *Id.,* Ex. C at 38.

6. Plaintiff also asserts that Dr. Bauer was acting as a neurologist when he was treating Plaintiff. Thus, according to Plaintiff, Dr. Fink is qualified to opine on the standard of care required of Dr. Bauer.[14] But Dr. Fink must demonstrate familiarity with the field of medicine practiced by Dr. Bauer. Delaware law provides that the "standard of skill and care required of every health care provider in rendering professional services or health care to a patient shall be that degree of skill and care ordinarily employed in the *same or similar field of medicine as defendant* . . . ."[15] There is nothing in the language of the statute that would justify holding an emergency room physician to the standard of care of a neurologist simply because an emergency patient presents a possible neurological problem. Generally speaking, emergency room physicians have completed residencies in emergency room medicine, and emergency medicine is one of twenty-four specialty board certifications recognized by the American Board of Medical Specialties. In short, an emergency room physician has training and skills which, although may overlap in some instances, are for the most part distinct from those of board certified neurologists. The fact that Dr. Bauer's care of Plaintiff touched upon neurological issues does not mean he is acting as a neurologist any more than his emergency treatment of a high school football player with an injured knee means he is acting as an orthopedic surgeon.

---

[14] Plt. Resp. ¶ 2.
[15] 18 *Del. C.* sec. 6801 (7)(emphasis added).

7. The court emphasizes the limited scope of today's holding. Dr Fink is highly regarded and has testified many times in this court as an expert in neurology. But although "[a]n expert may be highly qualified and competent to offer many opinions," they "must be competent to offer opinions in a *given specific factual setting*."[16] This is not the case here.

Accordingly, Defendant's motion to preclude standard of care testimony from Dr. Fink is **GRANTED**.[17]

_____
John A. Parkins, Jr.
Date:     November 3, 2014          Superior Court Judge

oc:  Prothonotary

cc:  Ben T. Castle, Esquire, Bruce L. Hudson, Esquire -  Hudson & Castle Law, LLC, Wilmington, Delaware
Stephen J. Milewski, Esquire - White & Williams LLP, Wilmington, Delaware
Richard Galperin, Esquire, Courtney R. Hamilton, Esquire – Morris James LLP, Wilmington, Delaware

---

[16] *Friedel v. Osunkoya*, 994 A.2d 746, 751 (Del. Super. 2010) (citing Eskin v. Carden, 842 A.2d 1222 (Del. 2004) (emphasis added). In *Friedel* the court addressed whether a pharmacologist could offer a standard of care opinion regarding a physician. *Id.* at 761-62. It acknowledged that 18 *Del. C.* § 6854 did not explicitly bar a pharmacologist from offering their opinion. *Id.* However, by relying on "a long period of . . . accepted judicial interpretation" it precluded such opinion testimony because the two professions were not the same and did not receive the same training. *Id.* at 762. To be sure the long standing judicial interpretation was not erroneous, the court independently performed its own statutory interpretation. *Id.* at 763. The court opined that when reading 18 *Del. C.* section 6853 together with section 6854, an expert as referred to in section 6854 must be within a similar field of medicine, "otherwise an affidavit of merit [required under section 6853] would have to be executed by an expert more qualified than an expert who meets the 'qualification' of an expert as defined in § 6854." *Id.* at 764.

[17] Nothing in this order should be construed as a limitation on causation testimony from Dr. Fink. That issue was not before the court.